**Jean Patrick MICHEL, Petitioner**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent**

**No. 4:CV–99–1879.**

United States District Court, M.D. Pennsylvania.

Nov. 3, 2000.

Sandra L. Greene, York, PA, for petitioner.

Kate L. Mershimer, Assistant United States Attorney, Harrisburg, PA, for respondent.

### MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

On October 22, 1999, petitioner Jean Patrick Michel, acting *pro se*, commenced this action by filing a document denominated "Motion for bond/relief under 28 U.S.C. [§] 2241." Michel is a native and citizen of Haiti who is currently a detainee of the Immigration and Naturalization Service (INS). He is subject to a final order

of deportation issued December 3, 1997, but INS has not been able to effectuate the deportation, apparently due to slow action on the part of Haiti. Succinctly stated, Michel seeks release on bond pending his removal.

Before the court is the report and recommendation of U.S. Magistrate Judge Thomas M. Blewitt, which recommends that the petition be denied.

## DISCUSSION:

### I. STANDARD

A district court is required to review *de novo* those portions of a magistrate judge's report to which objections are made. *Commonwealth of Penna. v. United States*, 581 F.Supp. 1238, 1239 (M.D.Pa.1984); 28 U.S.C. § 636(b)(1). When no objections are filed to the report of a magistrate judge, a court has discretion to review that report as it deems appropriate. A magistrate judge's finding or ruling on a motion or issue properly becomes the holding of the court unless objections are filed. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). However, the district court may not grant a motion for summary judgment, Fed.R.Civ.P. 56, or a motion to dismiss under Fed.R.Civ.P. 12(b)(6) solely because the motion is unopposed; such motions are subject to review for merit. *Stackhouse v. Mazurkiewicz*, 951 F.2d 29, 30 (3d Cir. 1991); *Anchorage Associates v. Virgin Islands Board of Tax Review*, 922 F.2d 168, 174 (3d Cir.1990).

Michel has filed objections to the report and recommendation which we review *de novo*.

### II. STATEMENT OF FACTS AND PROCEDURAL HISTORY

Michel is a native and citizen of Haiti who entered the United States on September 11, 1971, as a lawful permanent resident. In October, 1997, INS issued an order to show cause alleging that Michel had been convicted twice in 1994 of criminal possession of stolen property, and was therefore removable under 8 U.S.C. § 1227(a)(2)(A)(ii). An immigration judge found Michel removable, a decision upheld by the Board of Immigration Appeals (BIA) on October 27, 1998. However, the Court of Appeals for the Second Circuit issued a stay of removal during the pendency of an appeal to that court. The Second Circuit has since affirmed the final order of removal and lifted the stay. *Michel v. I.N.S.*, 206 F.3d 253 (2d Cir.2000). *See also* 8 U.S.C. § 1229b(c)(6). The removal is based on Michel's two convictions for crimes of moral turpitude.

While the appeal was pending, Michel requested release on a $15,000.00 bond. The District Director in New York denied the request and notified Michel that he had the right to appeal to the BIA. No appeal from the denial was filed.

Originally, Michel was released on bail by an immigration officer. However, the immigration judge revoked bail, stating that Michel was ineligible. Michel has remained in custody while INS attempts to effect his deportation to Haiti. Although Haiti accepts deportees from the United States, the process is slow.

Given the above recitation, the issues before this court are limited. Michel is not one of those aliens subject to removal whose native country will not accept him, so that he is not likely to be subject to permanent detention. Also, there is no question regarding deportability, as any such question is answered by the Second Circuit's affirmance of the order of removal. Further, Michel may not petition for a waiver of deportation because he previously has received such a waiver. 206 F.3d at 257. The sole question is whether a resident alien who is subject to removal for committing crimes of moral turpitude has the right to be released on bond because his native country moves slowly to accept him. As recited by the magistrate judge, Michel has stated the issue as whether the failure to release him from custody on bond after the expiration of the 90–day

removal period violated his right to due process. Report and Recommendation at 3 (quoting Petitioner's Amended Reply to Respondent's Brief at 1).

## III.  JURISDICTION

As a preliminary matter, we note that INS argued before the magistrate judge that the court lacked jurisdiction over the denial of bond pursuant to 8 U.S.C. § 1226(e). The undersigned judge so held in *Jacques v. Reno,* 73 F.Supp.2d 477 (M.D.Pa.1999). In *Chi Thon Ngo v. I.N.S.,* 192 F.3d 390 (3d Cir.1999), our Court of Appeals held, though without analysis, that the district court had jurisdiction over a petition for a writ of habeas corpus under § 2241. *Id.* at 393 (citing *Sandoval v. Reno,* 166 F.3d 225, 237–238 (3d Cir.1999); *DeSousa v. Reno,* 190 F.3d 175, 182 (3d Cir.1999)).

The petitioner in *Chi Thon Ngo* was an excludable alien who was subjected to exclusion proceedings for lack of a valid immigrant visa and for conviction of crimes of moral turpitude and aggravated felonies. *Id.* at 392. He claimed to be eligible for release because his country of origin would not accept him. *Id.* at 393. The statutory provision on which we relied in *Jacques,* § 1226(e), also would apply to proceedings involving a petitioner like that in *Chi Thon Ngo.* It follows, then, that the Third Circuit necessarily has abrogated *Jacques* to the extent we found that our jurisdiction to entertain a petition for a writ of habeas corpus had been repealed by § 1226(e).[1]

We turn, then, to the merits of the petition.

## IV.  RELEASE ON BOND

As noted, Michel claims to be entitled to release on bond or under an order of supervision because the 90–day period for removal has expired. The claim is asserted as arising under the Due Process Clause of the Fifth Amendment.

Once an alien is ordered "removed," INS[2] is afforded a 90–day period in which to effect removal. 8 U.S.C. § 1231(a)(1)(A). The alien is subject to detention during the removal period. Sec. 1231(a)(2). After expiration of the 90–day period, the alien may be released under specified conditions. § 1231(a)(3). While aliens such as Michel who are deportable under § 1227(a)(2)(A)(ii) *must* be detained pending a final order of removal, 8 U.S.C. § 1226(c)(1)(B), inadmissible aliens, aliens removable under 8 U.S.C. § 1227(a)(1)(C), (a)(2), or (a)(4), and aliens determined to be a risk to the community or unlikely to comply with the removal order *may* be detained after expiration of the 90–day period. § 1231(a)(6). *See also* 8 C.F.R. §§ 241.1 et seq. (regulations governing post-hearing detention and removal, including continued detention and conditions of release).

Michel argues, however, that this statutory language violates his right to substantive due process because it requires that he be kept in prolonged detention, i.e. deprives him of his fundamental right to liberty, without an adequate governmental interest justifying the intrusion. The basic

---

**1.** We noted in *Jacques* that our analysis might be in conflict with that applied in cases decided by the Third Circuit, which in turn we felt were in conflict with *Reno v. American–Arab Anti–Discrimination Committee,* 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999). However, the Third Circuit precedent was distinguishable, and we therefore were able to resolve *Jacques* so as to avoid any conflict with Third Circuit decisions. *Jacques* at 481–482. In *DeSousa,* the Third Circuit read *American–Arab* far more narrowly than we did in *Jacques.* We do not believe that we have any

further authority to read *American–Arab* as we see fit, but must do so in light of *DeSousa.* *See also Liang v. I.N.S.,* 206 F.3d 308 (3d Cir.2000).

**2.** Although the governing statutes refer to the authority and duties of the Attorney General, responsibility for immigration matters has been delegated to INS, and so we refer to INS for present purposes. Also, we refer to the codified version of the statutes for ease of reference and reading.

disagreement between the parties is the extent to which Michel's asserted liberty interest is cognizable under the substantive component of the Due Process Clause.

This disagreement also is reflected in opinions by judges of this court on which the parties rely. In *Sombat Map Kay v. Reno*, 94 F.Supp.2d 546 (M.D.Pa.2000), Judge Rambo found that a deportable alien whose country of origin would not accept him was entitled to release on conditions. Judge Caldwell disagreed, finding that periodic review of an alien's continued detention satisfied the Due Process Clause. *Cuesta Martinez v. I.N.S.*, 97 F.Supp.2d 647 (M.D.Pa.2000). We begin with some of the case law leading to those decisions, as well as opinions issued thereafter which put the decisions into context.

### (A) Other Authority

In *Chi Thon Ngo*, the petitioner was a native of Viet Nam who was paroled into the United States in 1982. He was convicted in state court for firearm possession and for attempted robbery in unrelated events. He was ordered to be deported in 1995 because he lacked a valid visa, he committed a crime involving moral turpitude, and he committed two crimes for which the sentences imposed were greater than five years. Important in the analysis was the fact that the petitioner was paroled into the country, meaning that he had not been admitted formally and was considered to have the status of an applicant for admission, despite his lengthy residence in the United States. *Id.* at 392 and n. 1.

The petitioner claimed that Viet Nam's refusal to take him back meant that he was subject to virtually indefinite detention. *Id.* at 392–393. The Third Circuit first reviewed the applicable provisions of the Immigration and Nationality Act, both before and after amendment through the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104–208, 110 Stat. 3009. Because both versions of the statutes granted INS the authority to detain or release on conditions, there was no need to determine which version applied. *Id.* at 394–395.

There are conflicting constitutional and policy considerations at issue in that Congress has attempted to insulate the national community from potentially dangerous criminal aliens, and aliens released from custody have a great potential to abscond, but those aliens have due process rights. *Id.* at 395. The problem was to find a way of satisfying these conflicting interests.

The Third Circuit first noted that the exclusion of aliens is a matter generally for the political branches and that, in many instances, the exercise of the power over naturalization and immigration would be unacceptable if applied to citizens. *Id.* at 395–396. Still, an alien is a "person" entitled to substantive due process protection and, in some circumstances, procedural due process. *Id.* at 396. The Third Circuit then reviewed a number of cases involving the detention of excludable aliens in which courts found no substantive due process violation. The one exception was a case decided before INS promulgated regulations relating to periodic parole review for Mariel Cubans. Also, one case involved a deportable alien whose continuing detention was upheld, subject to the same regulations. *Id.* at 396–397. The Third Circuit summarized these holdings as follows:

> ... [T]here is no constitutional impediment to the indefinite detention of an alien with a criminal record under a final order of exclusion, deportation, or removal if (1) there is a possibility of his eventual departure; (2) there are adequate and reasonable provisions for the grant of parole; and (3) detention is necessary to prevent a risk of flight or a threat to the community.

*Id.* at 397.

Therefore, while recognizing that the "entry fiction" is precisely that, a fiction,

and that detention indeed is tantamount to punishment, the Third Circuit concluded that continued detention for lengthy periods was permissible as long as adequate provisions for parole are available. *Id.* at 397–398. Its holding was limited to excludable aliens, with no views expressed on the applicability of the same principles in cases involving deportable aliens. *Id.* at 398 n. 7. Because the regulations governing parole review for the Mariel Cubans satisfied the Due Process Clause if applied properly, and negotiations were underway with Viet Nam (so that detention could not be said to be permanent), INS was given 30 days to conduct the necessary parole review or the petitioner would be released. *Id.* at 398–399.

For present purposes, the upshot of *Chi Thon Ngo* is that, at least as applies to excludable aliens, prolonged detention does not violate due process as long as the type of review described therein is provided. The question becomes whether the same principle will apply to deportable aliens.

One of the cases cited by Judge Rambo in *Sombat Map Kay* is *Binh Phan v. Reno,* 56 F.Supp.2d 1149 (W.D.Wash.1999) (*en banc* ).[3] In that case, the five judges of the Western District of Washington sat *en banc* to review five "lead cases" so that they would have a common framework for analyzing due process claims in a large number of immigration cases then pending. *Id.* at 1151. In an opinion by Chief Judge Coughenour, the court first reviewed the statutory and regulatory framework, determined that it had jurisdiction under § 2241, and rejected a government argument that administrative exhaustion was required before the court should entertain the claims. *Id.* at 1151–1153. It then turned to the petitioners' due process arguments.

Initially, the court noted that all aliens have liberty interests under the Fifth Amendment, but that excludable aliens are limited in that interest to the procedure explicitly authorized by Congress due to the entry fiction. *Id.* at 1153–1154. However, because lawfully admitted aliens develop ties that go with permanent residence, their constitutional status changes, and they are entitled to greater protection under the Due Process Clause. *Id.* at 1154. *See also id.* at 1154 n. 6 (referring to the foregoing principle as the "assimilation doctrine").

Having noted that the first question in substantive due process analysis is a careful description of the asserted right, the court rejected the government's description of the right as the right to be released into the United States pending removal. Rather, the right is the fundamental interest in liberty generally. *Id.* at 1154. Because the described right is fundamental, the questioned government action is subject to "strict scrutiny," meaning that "a deprivation will comport with due process only if it is narrowly tailored to serve a compelling government interest." *Id.* at 1154–1155 (citation omitted).

Applying this standard, the court looked at the asserted government goals in detaining deportable . criminal aliens and whether the detention is excessive in light of those goals. It also examined the goals in the context of the government's (or at least the political branches') usual plenary authority over immigration matters. It rejected a more deferential standard be-

---

**3.** In *Kim Ho Ma v. Reno,* 208 F.3d 815 (9th Cir.2000), the Court of Appeals for the Ninth Circuit conducted a statutory analysis and determined that INS lacks authority to detain an alien beyond the 90–day removal period if the alien cannot be returned to his or her native land due to the absence of a repatriation agreement. *Ma* was one of the cases consolidated for *en banc* review in *Binh Phan,* and has been consolidated with *Zadvydas v.* *Underdown* (discussed later in this opinion) for review by the Supreme Court on *certiorari.* For present purposes, then, *Binh Phan* has been abrogated and *Ma* represents the law of the Ninth Circuit. The reasoning of *Binh Phan,* however, has been adopted by a number of district courts and it remains an important opinion. *See Cuesta Martinez* at 650 (collecting cases). It is for this reason that we undertake our examination of *Binh Phan.*

cause there was no need to extend such deference beyond the deportation order, as the governmental interests asserted (prevention of flight and protection of the public) are domestic, and not foreign policy, matters. *Id.* at 1155. The court concluded that, balanced against the likelihood that the government would effectuate removal and the dangerousness of the individual alien, the detention of an alien did not comport with substantive due process when there is no realistic chance that the alien will be removed. *Id.* at 1155–1156.

Diametrically opposed to *Binh Phan* is *Zadvydas v. Underdown*, 185 F.3d 279 (5th Cir.1999), *reh'g en banc denied, cert. granted*, —— U.S. ——, 121 S.Ct. 297, —— L.Ed.2d —— (2000). The petitioner in that case had a complicated history relating to his country of origin because his parents were "displaced persons" in Germany in the aftermath of World War II. Both parents were from historically disputed territory which, at various times, was independent Lithuania, territory of Nazi Germany, or part of the Soviet empire. In addition, Germany requires birth of German blood for citizenship, as opposed to birth on its territory (as would apply in the United States). The complications arising from this parentage prevented easy resolution of the problem of finding a country willing to accept the petitioner after removal from the United States. In addition, the Dominican Republic, the country of origin of the petitioner's wife, did not respond to inquiry from INS. Regardless, the petitioner had been admitted lawfully to the United States but had committed offenses which left him subject to a final order of deportation. He was detained by INS as a flight risk. *Id.* at 283–284.

The Fifth Circuit also reviewed the statutory and regulatory context of the petition and found jurisdiction. *Id.* at 285–288. It then reviewed precedent concerning the sovereign's power to control immigration matters, describing this power as "essentially plenary." *Id.* at 288–289.

While aliens have rights as "persons" for purposes of the Fifth Amendment, those rights are limited by the sovereign's plenary powers. Thus, while an illegal alien cannot be sentenced to hard labor without due process, *id.* at 289 (citing *Wong Wing v. United States*, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896)), the constitutional rights of aliens may be restricted when they conflict with the sovereign's plenary power. *Id.* (citing, *inter alia, Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (citizens had First Amendment interest in listening to communist agitator, but government could exclude agitator; by implication, agitator's interest in speech did not outweigh plenary power)).

The Fifth Circuit then distinguished *Wong Wing*, in which the alien was summarily punished to a year at hard labor and thereafter to removal from the United States. The Supreme Court itself noted in that opinion that detention pending deportation is not the same as detention as punishment for being illegally present in this country because the former is necessary to the deportation proceedings. *Zadvydas* at 289 (quoting *Wong Wing* at 980; removal proceedings "would be in vain" if the alien could not be detained).

The Fifth Circuit then restated the principle that excludable aliens could be detained for an indefinite period of time pending removal, citing its prior holding in a case involving Mariel Cubans. *Id.* at 290 (citing *Gisbert v. U.S. Attorney General*, 988 F.2d 1437 (5th Cir.1993)). It rejected the petitioner's argument that, as a deportable alien, he had greater substantive rights than an excludable alien. The difference in rights applies to the procedural protections applicable to the decision to deport, as compared to the decision to exclude, and does not affect substantive rights once there has been a decision to deport or exclude. *Id.*

Next, the court engaged in an analysis of whether the petitioner's detention in fact could be considered permanent, and

determined that it could not, at least not until potential avenues for finding a country which would accept him were exhausted. *Id.* at 291–294. It then returned to the question of a deportable alien's substantive rights.

With respect to excludable aliens, when they seek to enter this country, they are requesting a privilege rather than asserting a right. Exclusion therefore is not a deprivation of rights but a denial of a privilege, which, in combination with the deference due in immigration matters, means that the decision is not subject to procedural limitations. Moreover, most substantive rights are constrained by the government's need to control immigration. *Id.* at 294. To the extent that substantive rights are infringed in a manner unconnected to the immigration power, an excludable alien may assert such rights. This would include the right to be free from malicious infliction of cruel treatment. *Id.* at 295.

In contrast, resident aliens are entitled to procedural due process prior to removal. This right arises from their continued presence in the country and the ties that naturally arise therefrom. Still, the plenary power is not extinguished, and the fact that the standard for evaluating the procedures used is lower than would be applied in the case of a citizen demonstrates the continued viability of the plenary power. *Id.* (also collecting cases). Nothing in the case law reviewed, however, indicated that a deportable alien has greater substantive rights than excludable aliens when the right asserted and the government interest asserted are the same. *Id.*

> In the circumstances presented here, the national interest in effectuating deportation is identical regardless of whether the alien was once resident or excludable. When a former resident alien is—with the adequate and unchallenged procedural due process to which his assertion of a right to remain in this country entitles him—finally ordered deported, the decision has irrevocably been made to expel him from the national community. Nothing remains but to effectuate this decision. The need to expel such an alien is identical, from a national sovereignty perspective, to the need to remove an excludable alien who has been finally and properly ordered returned to his country of origin.... Whether the party to be deported is an excludable or a former resident, the United States has properly made its decision and earnestly wishes—if for no other reason than to save the cost of detention—to deport the detainee. And deportation itself is not punishment....

*Id.* at 296 (citations omitted).

The Fifth Circuit continued by pointing out that the fact that deportation cannot be effected immediately is not a ground for distinguishing between deportable and excludable aliens. In both instances, the government's interest is in preventing crimes against the populace and preventing flight which would defeat the deportation decision. The court emphasized that society must tolerate levels of recidivism from citizens but need not be so generous to non-citizens. Also, the legitimacy of the government's concern about flight is reflected in the fact that the event has occurred with some frequency. *Id.* at 296–297. To the extent that a resident alien has an interest greater than that of an excludable alien, that interest is in the procedural protections honored in making the deportation decision, and that difference disappears once the final decision is made. *Id.* at 297.

For these reasons, the Fifth Circuit concluded that INS could detain deportable aliens subject to the same limitations (good faith efforts to effect deportation, along with reasonable parole and periodic review procedures) as apply to the detention of excludable aliens subject to prolonged detention. *Id.* The court specifically rejected the conclusions reached by the Western District of Washington. *Id.* at 297 n. 20.

Even more recently, the Tenth Circuit addressed the same issues in *Duy Dac Ho v. Greene,* 204 F.3d 1045 (10th Cir.2000). The petitioners (two cases were consolidated on appeal) were both natives and citizens of Viet Nam who entered the United States lawfully but were subjected to final orders of removal for having committed aggravated felonies. *Id.* at 1048. The district court granted petitions under § 2241 after reading the governing statutes as not authorizing continued detention and concluding that continued detention violated the petitioners' substantive due process rights. *Id.* at 1049–150. For reasons not relevant to this discussion, the Tenth Circuit concluded that it had jurisdiction and that the statutes permitted indefinite detention. *Id.* at 1050–1057. In addressing the substantive due process argument, the court first noted that it was not bound by a prior opinion in which the constitutional analysis was viewed properly as dicta. *Id.* at 1057.

The court next characterized the asserted right not as a general right to be free of incarceration without a criminal trial, but as a right to be at large in the United States, the very right denied them by the final orders of removal. The rationale was that their petition in effect was a request to be readmitted to the United States. *Id.* at 1058. Although aliens present in the United States are persons for purposes of the Fifth Amendment, the petitioners' heightened constitutional status was stripped by the final orders of deportation and they stood as applicants for admission, with no greater expectations than first-time applicants. *Id.* at 1058–1059.

Addressing the argument of one petitioner who claimed greater rights as a former lawful resident alien, the Tenth Circuit relied on *Zadvydas* and found no distinction between former resident aliens and excludable aliens. *Id.* at 1059. It therefore concluded that the petitioners had no due process right, substantive or procedural, of which they were deprived through the denial of "their application for entry," and the district court's judgment was reversed. *Id.* at 1060.

One judge dissented in *Duy Dac Ho,* essentially for the reasons recited in *Binh Phan. Duy Dac Ho* at 1060–1063.

The final case to be taken into consideration is *Kim Ho Ma v. Reno,* 208 F.3d 815 (9th Cir.2000). In that case (an appeal of one of the five lead cases in *Binh Phan*), the Ninth Circuit concluded that the Immigration and Nationalization Act does not confer authority on INS to detain indefinitely any alien subject to removal whose country of origin will not permit repatriation. We believe that § 1231(a)(6) plainly allows detention where it states that specified aliens "may be detained beyond the removal period. . ." Moreover, in *Chi Thon Ngo* (at 394–395), the Third Circuit held that § 1231(a) authorizes indefinite detention of excludable aliens, and the same provision applies to deportable aliens. It follows that the Third Circuit's statutory analysis directly contradicts *Kim Ho Ma* and the principles discussed therein cannot be said to be the law of this circuit. We therefore address *Kim Ho Ma* no further.

It also should be noted that the Supreme Court has granted petitions for certiorari in *Zadvydas* and *Kim Ho Ma,* and has consolidated the cases. *Zadvydas v. Underdown,* —— U.S. ——, 121 S.Ct. 297, —— L.Ed.2d —— (2000). While further guidance on the issue before us therefore appears forthcoming, we do not defer disposition of the pending matter because we resolve it in favor of INS. That is, we conclude that Michel is subject to continued detention with periodic review. In effect, the status quo is maintained thereby, a result which would not differ if we awaited the Supreme Court's disposition of *Zadvydas.* We therefore do not do so.

### (B) Opinions of Other Middle District Judges

As noted, in *Sombat Map Kay,* Judge Rambo concluded that the detention of a deportable alien whose country of origin

would not accept him violated his right to substantive due process. Her reasoning essentially parallels that of *Binh Phan.* She began with a review of the relevant statutes and regulations, as well as general substantive due process principles. *Sombat Map Kay* at 548–549. She then rejected INS's position that the right at issue was release into the national community, deciding instead that the asserted right was to be free from restraint behind bars. *Id.* at 549. Because the fundamental right to liberty was at issue, strict scrutiny applies. *Id.* at 549–550.

Examining the interests at issue, Judge Rambo agreed that the government asserted three legitimate regulatory purposes: executing the petitioner's removal, preventing flight before removal, and preventing danger to the community. The latter two derived solely from the first, but still could be considered compelling. *Id.* at 550. She also recognized the sovereign authority to control the borders through immigration laws, but found the principle inapposite. That is, the petitioner sought to be released from detention pending removal and could not be considered "at the border" in the sense in which the entry fiction normally applies. *Id.* at 550–551. Also, the plenary power applies to exclusion and deportation of aliens, not to their detention, so that "the government's interests are not at their maximum level, and the government's power is not plenary." *Id.* at 551 (also citing *Binh Phan* for the principle that the interests at stake are domestic, not international, matters).

While recognizing that the petitioner's conviction was for a serious offense, and that he had admitted other serious acts, Judge Rambo noted that, when the likelihood of deportation is low or nonexistent, the government's primary purpose in detention "is nonsensical, and the other derivative purposes cannot support indefinite detention." *Id.* She then pointed out that length of detention is an important factor in strict scrutiny analysis. *Id.* at 551–552. At some point, the length of detention

exceeds any regulatory need and becomes merely punitive in nature. *Id.* at 552. Judge Rambo then concluded the strict scrutiny analysis by pointing out that the petitioner had not committed any acts subjecting him to discipline while detained and had completed several programs. His family had indicated it would provide him with a home and other assistance if released. It appeared, then, that the risk of flight or dangerousness was low, and he had been detained for some two years with little chance of repatriation at any time in the foreseeable future. Judge Rambo therefore concluded that the prolonged detention was excessive. *Id.* at 552–553.

Turning to INS's argument that *Chi Thon Ngo* was binding, Judge Rambo distinguished the case as limited to excludable aliens, as specified therein. *Sombat Map Kay* at 553 and n. 9 (citing *Chi Thon Ngo* at 398 n. 7). She then reviewed authority supporting the proposition that aliens who have been admitted to the country have greater constitutional status than excludable aliens. Once again, that status is premised on the "entry fiction," which has no applicability beyond the stage at which a determination is made concerning admission. *Id.* at 553–554. Judge Rambo then rejected the holdings of *Duy Dac Ho* and *Zadvydas* as essentially expanding the entry fiction to deportable aliens. Also, the court in *Zadvydas* did not identify the level of analysis (strict scrutiny, rational basis, or some intermediate level) which it was applying. *Sombat Map Kay* at 554–556.

Finally, Judge Rambo found it inappropriate to expand the entry fiction beyond the context for which it was created, i.e. permitting detention of aliens physically present in the country pending a determination of admissibility. Rather, language employed by the Third Circuit in *Chi Thon Ngo* supported her reasoning by taking length of detention into consideration. *Sombat Map Kay* at 556–557. She therefore granted the writ of habeas corpus, directing INS to release the petitioner

subject to conditions, absent a showing within 90 days that removal was likely in the foreseeable future. *Id.* at 557.

In *Cuesta Martinez*, Judge Caldwell disagreed with Judge Rambo and followed *Zadvydas*. After a discussion of the applicable terminology, he turned to INS's contention that *Chi Thon Ngo* applied, despite the stated limitation on its holding. Judge Caldwell first noted that the petitioner's position was based on *Binh Phan* and then noted Judge Rambo's reliance thereon, continuing with a summary of the holding in *Sombat Map Kay*. *Cuesta Martinez* at 649–650. He also pointed out the contrary holdings in *Zadvydas* and *Duy Dac Ho*, and several district court opinions which followed *Binh Phan*. *Cuesta Martinez* at 650.

Judge Caldwell emphasized that aspect of the reasoning in *Zadvydas* equating the status of both excludable aliens and aliens subject to a final order of deportation. Of importance is the fact that neither has any further right to remain in the United States, as all that remains is to effectuate repatriation. The interest from a national sovereignty perspective is identical. *Cuesta Martinez* at 650–651 (quoting *Zadvydas* at 296). In contrast, the principles underlying *Binh Phan* are derived from *Landon v. Plasencia*, 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982), which established the assimilation doctrine discussed above. That doctrine, however, is inapplicable once a final order of removal issues because it applies to the procedural protection afforded a deportable alien, and the alien's ties to this country are severed by the final order. *Cuesta Martinez* at 651.

Judge Caldwell then distinguished another case cited in *Sombat Map Kay*, *Leng May Ma v. Barber*, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958). That case dealt with an alien paroled into the country who sought discretionary withholding of deportation based on persecution in her home country. The Supreme Court held that the parole did not allow her to assert that right, which was available to deporta-

ble aliens. The opinion simply has nothing to say about the rights of deportable aliens whose right to remain has been terminated. *Cuesta Martinez* at 652.

The next issue addressed was the purported failure of the court in *Zadvydas* to recognize that the law acknowledges an "acquired constitutional status" based on the fact of admission. *Cuesta Martinez* at 652 (quoting *Thien Van Vo v. Greene*, 63 F.Supp.2d 1278, 1283 (D.Colo.1999)). Judge Caldwell pointed out that the entry fiction ultimately derives from statutory, not constitutional, authority. The purpose is to determine what immigration proceeding is available to the alien based on his status as deportable or excludable, while constitutional analysis seeks to determine what liberty interest may be asserted. The interest (freedom from confinement) would be the same regardless of the alien's status as deportable or excludable. Judge Caldwell therefore agreed with the analysis of *Zadvydas* and concluded that the *Chi Thon Ngo* approach would be appropriate for analyzing the claim before him. *Cuesta Martinez* at 652.

Examining the parole reviews provided to the petitioner, Judge Caldwell concluded that INS was in substantial compliance with the procedure prescribed by the Third Circuit. To the extent it was not, there were good reasons (INS was awaiting a psychological report before providing written notification). The writ of habeas corpus was denied without prejudice to the petitioner's right to bring a future action based on future events. *Id.* at 652–653.

### (C) Our Determination

█ Having reviewed these cases, we conclude that Judge Caldwell and the Fifth Circuit have the better of the argument. Rather than merely state as much or reiterate the holdings of the cases consistent with this view, we set forth our reasons for disagreeing with Judge Rambo and the Western District of Washington in some detail.

Initially, we have some difficulty with the manner in which Judge Rambo reached her ultimate conclusion which is unrelated to the deportable/excludable distinction. After determining that the petitioner's right to be free from confinement outweighed the government's interest in effecting removal, as well as concluding that the derivative interests in public safety and flight risk failed as a matter of law once the interest in effecting removal was outweighed, Judge Rambo proceeded to examine the individual petitioner's dangerousness and flight risk. *Sombat Map Kay* at 552. However, once there was a determination that INS cannot detain a deportable alien if removal is not likely, the only questions are whether removal is likely and whether INS in fact is detaining the alien. The reasons for detention already had been found constitutionally inadequate, and any further balancing would be of no consequence. *See Cuesta Martinez* at 650 ("In these circumstances, the alien's liberty interest in being free from incarceration outweighs as a matter of law the government's interest in detention, even if there is evidence that the alien is a risk to the community, or possibly a flight risk."; citing *Sombat Map Kay* ).

■ Apart from that problem, however, we disagree with the view expressed in *Binh Phan* and its progeny that the right at issue is the freedom from incarceration. The fact of the matter is that, because no other country will accept the alien, the only place to which the alien may be released is the United States. However, as a result of the final order of removal, there is no right to be at large in the United States. In fact, there is no general right for non-citizens to be at large within the United States, and even the ·right of citizens to be at large is subject to limitations. *See generally Zadvydas* at 297 n. 19 (examples of citizens detained for protection of the public). As stated above, an alien's entry into the United States (and therefore the state of being at large within our national community) is a privilege, not a right.

Stated differently, to say that there is a right to freedom *from* incarceration necessarily implies a right *to* the opposite, i.e. that there is a right to be at large in the community. Since the necessary obverse does not exist for aliens, it is improper and an oversimplification to characterize the right as simply the freedom from incarceration.

Rather than finding that failing to distinguish between excludable and deportable aliens after a final order of removal improperly expands the entry fiction, we believe that making this distinction improperly expands the assimilation doctrine. The cases granting heightened constitutional status to aliens once admitted to the United States all refer to the process that is due before a final order of removal may issue. The idea is that an alien who has lived in this country for an extended period of time will have established ties through employment, family, friends, etc., which should not be taken away lightly. INS therefore is required to evaluate the case more carefully and with greater *procedural* protections than would apply to an alien subject to exclusion, who presumably would not have the ties to the community to the extent a resident alien would have.

However, once the order of removal becomes final, the resident alien no longer has a right to participation in our society and the ties which may have been established are no longer a significant consideration. Giving the former resident alien greater *substantive* rights expands the assimilation doctrine to cases to which it has not applied previously and into a context for which it was not intended.

That the assimilation doctrine is not subject to expansion is reflected in *Chi Thon Ngo,* in which the petitioner had been paroled into the United States in 1982. Presumably, such a person would establish the same sorts of community ties as a person formally admitted, yet he still was considered excludable for purposes of the appli-

cable proceedings, and did not have any heightened constitutional status for purposes of release pending removal.

Conversely, we do not see how failing to distinguish between deportable and excludable aliens in this context is necessarily an expansion of the entry fiction at all. Rather, it is an equation of the liberty interest on the part of the two "classes" of aliens. That is, neither has a right to be in the United States and is subject to repatriation at the earliest possible opportunity. The only difference in their circumstances was that the deportable alien was once a resident, and the interest to which that residence gave rise has been honored through greater procedural protections prior to the removal order. Once honored, the interest is extinguished for purposes of any further constitutional analysis, and the difference in circumstances no longer exists. The two are identical for purposes of any further due process analysis. This holding is not an expansion of the entry fiction; it is a limitation on the assimilation doctrine, which (as Judge Caldwell pointed out) had no constitutional basis to begin with, but ultimately derived from immigration law.

Another way of viewing this matter is to compare the asserted right to the right to personal liberty enjoyed by citizens. Reduced to its basic form, the holding of the cases finding a deportable/excludable alien distinction for substantive due process purposes is that a deportable alien subject to a final order of removal may not be detained by INS if there is no chance that removal will be effected in the foreseeable future. That is, the alien has an absolute right to parole under these conditions, despite having been afforded all necessary procedural protections before a final determination was made to deport the alien. A citizen charged with a serious criminal offense, however, may be held without bail pending trial despite not having been afforded all of the necessary procedural protections before a final determination of

guilt may be made. This conclusion flies in the face of logic.

Another way to view this matter is to take an example, albeit an extreme example. Suppose that a resident alien was arrested for an attempt to murder a prostitute, an offense which would render him deportable. While INS has custody, it is discovered that the alien is Jack the Ripper. Great Britain, after determining that its interest in pursuing criminal prosecution is outweighed by the danger of having such a person within its borders, might well decline extradition or repatriation. The logic of *Binh Phan* and its progeny would lead to a determination that the Ripper has an absolute right to be at large within our borders once his criminal sentence expires, a plainly unacceptable result.

While our example tends to the extreme, we use it only to point out there are people, such as aliens subject to a final order of removal, who have no right to be at large in the United States and as to whom the governmental interest in protecting the public outweighs any right against prolonged detention. Viewed from this perspective, the governmental interest cannot be seen as derivative of the interest in effecting the removal. Rather, it is an independent and important interest; actually, one of the (if not the single) most important of governmental interests.

In this context, we note our disagreement with *Binh Phan* and its progeny that the matter is entirely domestic. While a foreign nation's refusal to accept return of its nationals may be said to diminish the international or foreign relations aspect of the matter, the fact remains that the person in detention is an alien, not a citizen, and is subject to removal as soon as possible and with no right to be in the United States. The matter remains one of immigration law and not domestic law, and the plenary power remains in effect.

We also disagree with the characterization of detention pending removal as necessarily punitive. In *Chi Thon Ngo,* the

Third Circuit noted that characterizing prolonged detention as anything but punishment would be "puzzling to petitioner, who remained in jail under the same conditions as before the state released him, although his status had technically changed from that of a state inmate to an INS 'detainee.'" *Id.* at 397–398. Referring to the legal fiction that the detained alien is "free," the court added, "It is similarly unrealistic to believe that these INS detainees are not actually being 'punished' in some sense for their past conduct." *Id.* at 398. *See also Sombat Map Kay* at 550 n. 7 (quoting the latter statement).

The problem with relying on this quotation for a finding that detained aliens are being punished is that the "some sense" does not refer to the constitutional sense, or at least in a sense that the Constitution is being violated. That is, it is only when detention no longer satisfies a rational, non-punitive purpose that the detention becomes unconstitutional punishment. *Zadvydas* at 297 and n. 19.

For all of these reasons, we agree with Judge Caldwell, the Fifth Circuit, and the Tenth Circuit that there is no reason to distinguish between deportable and excludable aliens for purposes of detention pending removal. The reasoning of *Chi Thon Ngo* therefore applies in cases involving deportable aliens subject to a final order of removal. Such aliens may be detained by INS subject to periodic review for parole, including a thorough review of the alien's risk of flight and/or danger to the community.

### (D) Other Due Process Argument

In addition to the deportable/excludable distinction discussed above, Michel argues that an analysis of the sufficiency of the parole review procedure has not been made. Actually, a more thorough argument would be that the procedures fail such a test. Regardless, the Third Circuit undertook such an analysis in *Chi Thon Ngo,* which is binding on us. The analysis suggested by Michel would be superfluous.

Because of the conclusion we reach, we do not examine the effect of the fact that Haiti is simply slow to accept deportees, as opposed to nations which do not accept deportees. That is, Michel's situation is one of a slower process than normal, but there is no basis for a conclusion that removal will not be effected or is highly unlikely to be effected. Since INS is providing periodic review under these circumstances, the distinction is not material.

### V. REMOVAL PERIOD

Michel adds an argument that the magistrate judge misapplied the removal period provision. The statute provides in part:

> Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").

.      .      .      .      .

> The removal period begins on the latest of the following:
>
> (i) The date the order of removal becomes administratively final.
>
> (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.
>
> (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

8 U.S.C. § 1231(a)(1)(A), (B).

In reciting the procedural history of the case, the magistrate judge indicated that the BIA dismissed Michel's appeal on October 27, 1998, rendering the removal order administratively final and establishing January 25, 1999, as the end of the 90–day removal period. However, the Second Circuit issued a stay on February 9, 1999, and vacated the stay when it affirmed the BIA on February 4, 2000. Report and Recommendation at 2. According to Michel, the

magistrate judge's later conclusion that he had only recently fallen within the release provisions of § 1231 is incorrect.

This argument is based on a premise that there can be only one removal period, and that the magistrate judge was incorrect in reading the statute to allow the removal period to restart after the stay was vacated. Actually, that is the *only* rational reading of the statute.

According to Michel's reading, once the removal order became final and the removal period began, that was the only period of time which could be designated as the removal period. However, the statute provides that the removal period begins on the latest of several dates. The passing of one date does not stop the operation of the statute.

In a sense, the only way to apply the statute to a given situation is retrospectively. That is, the removal period begins when the removal order becomes final. If a court issues a stay, the removal period begins when the stay is lifted. Therefore, the only way to determine when the removal period begins, or began, is to look at what events already have occurred. If there is another potential event, there is another potential beginning date for the removal period. The only sensible reading of this provision is that INS is required to effectuate the removal within 90 days of certain events, but will have another 90 days if another one of the designated events occurs at a later date. The obvious reason for this is that INS's authority to effect the removal is suspended due to the occurrence of the later event (such as a stay order).

In Michel's case, the magistrate judge correctly determined that the removal period began on February 4, 2000, so that the instant petition is premature.

## VI. CONCLUSION

Based on the foregoing, we conclude that a deportable alien subject to a final order of removal may be detained by INS beyond the 90-day removal period. An alien subject to such detention is entitled to periodic review for purposes of release on conditions as described in *Chi Thon Ngo.* The time for such review begins on the date that the order becomes administratively final, the date on which any stay ordered by a court is vacated, or the date on which the alien is released from detention or confinement for other than immigration process. The beginning date of the 90-day removal period is not altered by the fact that one of these events may have occurred at an earlier time.

An order consistent with this memorandum will issue.

### ORDER

For the reasons stated in the accompanying memorandum, **IT IS ORDERED THAT:**

1. The report and recommendation (record document no. 18) of the magistrate judge is adopted as the holding of the court, as supplemented hereby.

2. Petitioner Jean Patrick Michel's exceptions (record document no. 19) to the report and recommendation are construed as objections to the report and recommendation under LR 72.3 of the Local Rules for the Middle District of Pennsylvania, and are overruled.

3. Michel's petition (record document no. 1) for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 is denied.

4. The clerk is directed to close the file.